# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WENDY KAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 04 C 6562 |
| ) | |
| CONSOLIDATED ROUTE, INC., ) | |
| PLAN #510 ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Wendy Kay has sued Consolidated Route, Inc., Plan #510 (Plan), the administrator of her employer-provided disability insurance policy, under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking to overturn the Plan's decision to deny her long term disability benefits (LTD). The case is before the Court on the parties' cross motions for summary judgment. For the reasons stated below, the Court grants the Plan's motion for summary judgment and denies Kay's motion for summary judgment.

### Facts

Kay worked as a regional operations manager for Win Stuff LLC (formerly known as Consolidated Route, Inc.), a purveyor of crane-and-claw amusement vending machines, from May 1996 to August 1, 2001. In that role, she established operational procedures, secured new vendors, negotiated contracts, oversaw daily operations, hired and trained staff, planned marketing strategies, and controlled inventory. To perform those duties, she occasionally lifted bags of stuffed animals, drove a car, and performed some squatting, kneeling, and stooping.

1

On May 26, 2000, Kay filed a worker's compensation claim with Win Stuff's worker's compensation insurer, Liberty Mutual Insurance Company, after she sustained a back injury while working on a machine. On June 13, in connection with that claim, Kay visited Dr. Martin Herman, her treating orthopedic physician. Dr. Herman examined Kay and opined, based on an MRI of Kay's lumbar and cervical spine, that Kay suffered moderate disc herniation and extremely mild bulges in various regions of the spine. He found no evidence, however, that these conditions caused any compression of the spinal nerve. He also noted that Kay's complaints of extreme pain had an "unusual discrepancy" with the MRI findings and that Kay was somewhat hostile because she felt strongly that her pain was being caused by her discs.

On June 26, Kay sought a second opinion from neurologist Dr. Lloyd Davis, who opined that "a detailed neurological examination was within normal limits." Then, on August 2, Kay's worker's compensation carrier referred her to a neurosurgeon, Dr. Marshall Matz, for an independent examination. He stated that Kay's neurological examination was objectively normal and concluded that there was a "histrionic, or exaggerated component" to Kay's complaints of pain. Consequently, he released her to work without any limitations.

On September 22, 2000, Kay obtained a third medical opinion from a neurologist, Dr. Avi Bernstein, who opined that Kay was neurologically intact. On October 2, after reviewing a CT myelogram of Kay's lumbar spine, Dr. Bernstein noted that Kay's symptoms might correlate to the spinal disc bulges shown on her CT scan. He recommended a regimen of weight loss and exercise.

On January 11, 2001, Kay saw hematologist Dr. David Hakimian and complained of aches all over her body. Dr. Hakimian reported that Kay had been running low grade fevers

2

between ninety-eight and ninety-nine degrees and was fatigued particularly toward the end of the day. He wrote that her symptoms suggested a systemic inflammation, possibly due to an autoimmune illness. On January 31, 2001, rheumatologist Dr. Gerald Eisenberg examined Kay and also noted complaints of diffuse musculosketal pain and fatigue, which Kay said had begun when she sustained her original work related injury. She also complained of depression and chronic sleep disturbance. Eisenberg said that Kay's workup was entirely unrevealing, and he opined that she most likely suffered from fibromyalgia.

On March 1, 2001, Kay claims, she suffered a sharp shooting pain down her back and legs while lifting a bag of coins at work. On March 23, she returned to her treating neurologist, Dr. Bernstein, who concluded that Kay might have suffered a slight disc herniation but had "no neurological findings." He also recommended that she stay away from work until April 2. On June 1, Kay began an approved maternity leave from work. On that same day, she returned to Dr. Bernstein and complained of weakness in her right leg and that she had fallen twice because her leg went out on her. On exam, however, Dr. Bernstein concluded that "despite [Kay's] subjective complaints, she has a normal gait. She is able to toe and heel walk and she has a normal neurological examination."

On August 1, Win Stuff terminated Kay's employment after she failed to return from an approved maternity leave.

On August 21, Kay returned to Dr. Eisenberg, who noted that the movement of her joints was good, though uncomfortable, and that her range of motion in the lumbar spine was somewhat limited and uncomfortable. He reasserted his opinion that she might be suffering from fibromyalgia and decided to reevaluate her after reducing her steroid intake. On August 22,

Liberty Mutual scheduled an independent medical examination (IME) with Dr. Jay Levin, an orthopedic surgeon, but Kay refused to allow him to examine her. Dr. Eisenberg performed a follow-up consultation on September 19 and noted that an examination of Kay's joints revealed discomfort with movement. He also said that Kay reported feeling worse since her visit the previous month, though her facial rash had improved. He observed no evidence of rheumatic disease and repeated his opinion that Kay suffered from fibromyalgia.

On September 24, 2001, Liberty Mutual scheduled a second IME with Dr. Stanford Tack, an orthopedist, and this time Kay agreed to be examined. She told Tack that she was completely incapacitated from the activities of daily living. Tack noted that Kay was "a very histrionic young woman." He said that "she exhibits extreme pain behavior which is. . . inconsistent during the process of history and physical examination" and that "the likelihood of surgical success. . . is quite low based on the fluctuating nature and distribution of her symptoms."

After Dr. Tack's IME, Kay returned to Dr. Eisenberg for a follow-up appointment on September 26, 2001. She complained that she had been feeling worse since her prednisone intake was reduced and that she had been experiencing activity-related pain in her left lower leg. After the examination, Dr. Eisenberg said that he was concerned about the possibility that Kay had Still's disease, a rheumatic illness (meaning it effects the bones and joints) characterized by persistent fevers, diffuse joint pain, and a salmon colored rash.

On September 28, Kay visited one of her treating physicians, Dr. Hendrix. He noted that Kay's primary complaint was lower back and leg pain, which she described as a ten on a scale of one to ten. She also complained of depression and lack of energy. In response to Dr. Hendrix's questions about other symptoms, Kay did not mention anything about fevers or diffuse joint pain

4

other than in her legs and back. For treatment, Dr. Hendrix recommended an epidural steroid injection.

On November 7, 2001, Kay applied for LTD benefits under the group insurance policy issued by Consolidated. The Plan allowed employees who could not perform the material and substantial duties of their regular occupation due to injury or sickness to receive LTD benefits for twenty-four months. After twenty-four months, the employee could continue to obtain benefits only if he or she was, "due to the same sickness or injury[,] . . . unable to perform the duties of any gainful occupation for which [she was] reasonably fitted by education, training or experience." Though Kay's coverage had ended on August 1, 2001, the date Win Stuff terminated her employment, the Plan paid disability claims if an employee was disabled prior to the cessation of coverage. Kay's LTD application included a physician's statement from Dr. Eisenberg in which he claimed that Kay's daily fevers and diffuse joint pain prohibited work of any kind.

On November 20, Dr. Eisenberg saw Kay again and noted that an MRI demonstrated an "insufficiency fracture" of her pelvis. He also noted that "related to her adult onset Still's [disease], she ha[d] been feeling much better on the prednisone" and that her peripheral joints moved well. He did observe some "trigger point tenderness in upper and lower back as well as over the lateral aspects of her thighs."

The Plan obtained Kay's medical records and asked nurse Tina Kelly to review them. On January 15, 2002, she concluded that there was no consistent documentation of elevated body temperatures. She also noted that the patient reported feeling better in November 2001. Also on January 15, the Plan asked Dr. Norman Brees, a rheumatologist, to review the medical records.

5

On January 28, he opined that he saw no evidence of rheumatic disease and that Kay probably suffered from fibromyalgia. Dr. Brees noted in particular Dr. Tack's IME, in which he described Kay as histrionic and found no significant abnormalities. Ultimately, Dr. Brees concluded, "There is no objective evidence in the record to support an impairment which would preclude the claimant from carrying out the duties of her occupation."

On February 8, the Plan consulted its medical director, Dr. Tonya Horne, who opined that Dr. Eisenberg's restrictions and limitations were "vague and not supported." The Plan then informed Kay, by letter and by phone, of its intention to decline her LTD claim. During the phone call, Kay stated that she would provide updated restrictions and limitations. In the letter, the Plan instructed Kay to support any further restrictions and limitations with medical documentation.

On February 21, the Plan received a physical abilities form signed by Kay's treating rheumatologist, Dr. Sidney Brandwein, who asserted that Kay was unable to spend any part of the day standing, sitting, walking, or driving. He also noted that though Kay could frequently lift up to five pounds, she was not allowed to spend any part of the day climbing, balancing, twisting, kneeling, reaching, or perform any other movement included on the form. Dr. Horne reviewed Dr. Brandwein's submission and opined that it included no objective measure of functionality and that Dr. Brandwein appeared to base the restrictions and limitations on Kay's self-reported symptoms. She further opined that while Kay seemed to be experiencing some inflammation, "there [was] no clinical examination finding of joint inflammation or significant impairment to support a total lack of work capacity."

On March 28, Kay wrote the Plan and stated that she suffered from fevers on a daily

6

basis and experienced migraines, fatigue, and achy pains. The Plan consulted Dr. Horne about the letter, but she stated that it did not alter her conclusion. On April 18, the Plan received a letter from Dr. Brandwein who stated that Kay "is completely disabled because of chronic fever, arthralgias, abdominal pain, diarrhea, and steroid side effects including a stress fracture of her pelvis."

On April 30, Kay requested an administrative appeal of the Plan's preliminary decision to deny LTD benefits. On June 25, the Plan received a letter from Kay's family physician, Dr. Rubina Hussein, who opined that Kay is "unable to perform even normal, simple household chores or take care of her kids without full support from her family" and that Kay "is completely disabled." On July 31, the Plan consulted with Dr. Horne, who reviewed the documents submitted by Kay as part of the administrative appeal as well as all the documents contained in the administrative record. On August 6, Dr. Horne prepared a medical consultant review report in which she stated that Kay's medical records did not support a diagnosis of Still's disease or a total lack of work capacity. On September 9, the Plan notified Kay of its decision to uphold its claim determination on appeal, thereby exhausting Kay's administrative remedies under ERISA. Kay filed the present lawsuit on September 15, 2004.

**Discussion**

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the

7

nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1996). The Court's role is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

As the Court previously ruled, the Plan gives the administrator discretionary authority to determine eligibility for benefits. Under ERISA, this means the Court reviews deferentially the Plan's decision to deny Kay LTD benefits, reversing only if the determination was arbitrary and capricious. *See Kobs v. United Wisc. Ins. Co.*, 400 F.3d 1036, 1039 (7th Cir. 2005). "The only question . . . is whether the administrator's decision was completely unreasonable." *Id*; *see also James v. General Motors Corp.*, 230 F.3d 315, 317 (7th Cir. 2000) (plan administrator's decision to be upheld unless it "not only made the wrong call but . . . a 'downright unreasonable' one") (citations omitted). Under this standard, the Court declines to reverse the administrator's decision.

The Plan argues, and Kay does not contest, that her employment – and thus her disability coverage – was terminated on August 1, 2001. Kay's policy states in relevant part, "Your coverage under the policy or a plan ends on . . . the last day you are in active employment . . . ." To recover benefits under the contract, therefore, Kay had to present medical evidence that she was disabled prior to August 1. Under the Plan's plain language, a person is disabled if she is "unable to perform the material and substantial duties of [a] regular occupation due to injury or sickness."

Kay essentially makes three arguments in support of reversing the administrator's decision: the Plan denied Kay's claims without having her examined by a rheumatologist and without conducting a functional capacity evaluation; the administrator's final decision was

biased because the decision maker was employed by the Plan; and Dr. Hakimian's and Dr. Eisenberg's reports establish that she was suffering from Still's disease prior to August 1, 2001.

Kay first argues that the administrator's decision should be reversed because the Plan failed to have her examined by a rheumatologist and failed to conduct a functional capacity evaluation. The Court rejects this argument. Under the contract, it was not the Plan's burden to prove Kay's disability claim for her. R. 510; *see also Washington v. Ameritech Sickness and Accident Disability Benefit Plan*, No. 00 C 6469, 2002 WL 1348691, *2 (N.D. Ill. June 19, 2002). To the contrary, under the Plan's terms, it was Kay's burden to supply proof of her claim in the form of medical documentation. R. 510. Her failure to do so cannot render the administrator's decision arbitrary and capricious.

Kay next argues that the opinions of the Plan's employees, particularly Dr. Horne and Dr. Brees, are unreliable because they are employees of the Plan. This line of argument, which essentially maintains that the Plan's conflict of interest renders its decision unreliable, has repeatedly been rejected by the Seventh Circuit. *See, e.g., Kobs*, 400 F.3d at 1039; *Leipzig v. AIG Ins. Co.*, 362 F.3d 406, 408-09 (7th Cir. 2004)

Kay finally argues that Dr. Hakimian's and Dr. Eisenberg's January 2001 reports establish that she had Still's disease before her coverage under the Plan ceased. She points to Dr. Hakimian's January 11 report, in which he documented Kay's complaints of persistent body aches and fevers and noted an elevated white blood cell count. She also points to Dr. Eisenberg's January 31 report, in which he documented "diffuse musculoskeletal discomfort" and chronic fatigue. Though the doctors never definitively diagnosed her with Still's disease, Kay argues that given the later diagnosis in September 2001, it is clear that she was suffering

9

from this disease some time prior to August 1, 2001.

This argument also falls short, because Kay must do more than demonstrate she had Still's disease. She must also show that the administrator was entirely unreasonable in concluding that the Kay's medical records did not demonstrate an inability to work. *See Houston v. Provident Life & Accident Ins. Co.*, 390 F.3d 990, 996 (7th Cir. 2004) (separating issue of whether plaintiff had a herniated disc from issue of whether she could work in a sedentary capacity). Stated otherwise, it does not follow from Kay's having Still's disease that she was not able to work. Dr. Hakimian's and Dr. Eisenberg's January reports do not discuss work restrictions.

It is true that on February 18, 2002, Dr. Brandwein submitted a physical abilities form listing a number of job restrictions, R. 433, but the form was completed six months after the purported date of disability, and, as the Plan points out, Dr. Brandwein's restrictions are so severe as to be unreliable on their face. The form suggests that Kay could not stand, walk, sit, drive, climb, balance, kneel, squat, crouch, reach, or twist for any amount of time while at work. The restrictions suggest that Kay was essentially bedridden at the time the evaluation was performed, though this undisputedly was not the case. More importantly, the restrictions – which were essentially the check-a-box variety – were unsupported by any underlying medical testing.

Furthermore, apart from the lack of documented work restrictions, other evidence affirmatively suggested that Kay was capable of working as of August 1, 2001. Three examining doctors – Herman, Matz, and Tack – all opined that Kay's pain complaints were inconsistent and exaggerated. R. 81, 89, 363-64. And, during her dozens of physician visits prior to August 1,

10

2001, Kay complained of diffuse joint pain only twice: once to Dr. Hakimian on January 11, 2001 and once to Dr. Eisenberg on January 31, 2001. R. 17, 238. Significantly, she made no mention of diffuse joint pain when she visited Dr. Bernstein on March 23, June 1, or August 3, 2001, R. 79, 80, 85, and she made no mention of it on June 25, 2001, when she visited her primary care physician, Dr. Banoff. R. 309. This evidence sufficiently supports the administrator's decision that Kay's medical records did not establish an inability to work prior to August 1, 2001.

Finally, Kay analogizes this case to *Davis v. Unum Life Ins. Co. of America*, No. 03 C 6362, 2005 WL 743082 (N.D. Ill. March 31, 2005), and *Crespo v. Unum Life Ins. Co. of America*, 294 F. Supp. 2d 980 (N.D. Ill. 2003). In *Davis*, the court held that the plan administrator's denial of disability benefits was arbitrary and capricious because the administrator:

> (1) relied on the conclusory and unsupported opinions of in-house doctors who had not examined Plaintiff; (2) relied on opinions of in-house doctors who had not examined plaintiff and who did not explain their basis for disagreement with the conclusions reached by Plaintiff's treating physicians; (3) failed to contact Plaintiff's treating physicians to discuss their diagnoses; (4) failed to refer Plaintiff to an independent medical expert for examination; and (5) ignored (or at least made no mention of) evidence and reports presented by Plaintiff's treating physicians.

*Davis*, 2005 WL 743082 at *12. The court found that "[t]he administrative record reflects a pattern in which Unum doctors briefly discuss the medical testing (in a sentence or two), and then conclude 'but Plaintiff's impairments do not render him physically unable to perform sedentary work.'" *Id.* at *13. The court noted in particular that the administrator rejected one doctor's evaluation which seemed to effectively document the plaintiff's disability. That doctor said,

11

> I have found Mr. Davis to be significantly impacted on a purely physical basis. He ambulates with the assistance of a wheeled walker due to a combination of leg weakness from postpolio syndrome and pain from spinal stenosis. These conditions make it difficult, if not impossible, for Mr. Davis to sit, stand or walk for any prolonged timeframes. He experiences numbness of his hands from carpal tunnel syndrome, which would preclude an excessive amount of writing or activities involving fine manipulative abilities or repetitive type activities. He has most recently had an episode of hypoglycemia in which he was found driving on the wrong side of the street incoherent requiring acute hospitalization, this secondary to his diabetes. *Id.* at *8.

In this case, Kay did not submit the kind of medical documentation that the administrator ignored in *Davis*. Dr. Brandwien's February 18, 2002 check-the-box form and Dr. Eisenberg's November 7, 2001 conclusory physician statement were unsupported by any medical documentation outlining why Kay's illness limited her ability to perform certain tasks on a date prior to August 1, 2001. As a result, *Davis* is distinguishable.

In *Crespo*, the court concluded that the plan administrator did not make a full and fair assessment of the plaintiff's LTD claim for a number of reasons that are not applicable here: the administrator failed to consider reports by a rheumatologist and a psychologist supporting the plaintiff's disability claim; it erroneously relied on an isolated reference, "?Fibromyalgia" as evidence that the plaintiff's own doctors doubted the plaintiff's diagnosis; it did not refer her for an independent examination, nor did it submit her records for an independent examination; and it made an adverse credibility determination about the plaintiff's complaints of stiffness and pain only because most people with fibromyalgia do not experience that much pain. *Crespo*, 294 F. Supp. 2d at 994-96. Problems of this sort are not present in Kay's case.

The Court in *Crespo* did note that the plan failed to contact treating physicians when it doubted the validity or support of the physicians' conclusions, and the Court shares that concern in this case. The Plan's review of Kay's medical history would have been more comprehensive

had it contacted Dr. Brandwien or Dr. Eisenberg to ask whether they believed Kay was disabled prior to August 1, 2001. But Kay has not cited – nor has the Court found – any case reversing or remanding because an administrator failed to contact all treating physicians in making its decision.

The issue in this case is whether the administrator's finding that Kay had not shown she was disabled *as of August 1, 2001* was arbitrary and capricious – not whether Kay became disabled at some later date. Kay has failed to make the necessary showing.

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment [docket no. 26] and denies plaintiff's cross motion for summary judgment [docket no. 37]. The Clerk is directed to enter judgment in favor of the defendants.

                                                                  /s/ Matthew F. Kennelly
                                                                    MATTHEW F. KENNELLY
                                                                    United States District Judge

Date: November 3, 2005